IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
NO. 2:13-CV-21-BO

| | |
|---|---|
| GARY WOODSON and REBECCA WOODSON,<br>　　Plaintiffs,<br><br>v.<br><br>ALLSTATE INSURANCE COMPANY,<br>　　Defendant. | )<br>)<br>)<br>)　FINDINGS OF FACT<br>)　AND<br>)　CONCLUSIONS OF LAW<br>)<br>)<br>) |

Plaintiffs, Gary and Rebecca Woodson, brought this civil action against defendant, Allstate Insurance Company ("Allstate"), asserting claims for breach of contract and unfair trade practices based on Allstate's denial of the Woodsons' insurance claim for flood-related damages to their property following Hurricane Irene. The Woodsons are insured by the Standard Flood Insurance Policy, issued to them by Allstate. The Woodsons filed a claim under this policy following Hurricane Irene, claiming that the property at issue—located at 114 Caco Street, Jarvisburg, Currituck County, North Carolina—was damaged by flood, flood-induced erosion, and wave action. Allstate contends that the damage to the property at 114 Caco Street was pre-existing or, if caused by Hurricane Irene, was damaged in a way that is not covered by the insurance policy.

The Court held a bench trial in this matter on April 25, 2016, in Elizabeth City, North Carolina. After the close of evidence, the Court ruled from the bench that Allstate breached its contract with the Woodsons, that the denial was in bad faith and, thus, that the Court would consider imposing a judgment that included damages for unfair and deceptive trade practices. In support of its ruling, the Court makes the following findings of fact and conclusions of law as to

whether Allstate breached its contract with the Woodsons, whether doing so constituted unfair trade practices, and the amount in damages the Woodsons are due as a result.

## FINDINGS OF FACT

Hurricane Irene struck on and around August 27, 2011. It was a fierce, fast-moving storm that moved east across communities in northeastern North Carolina with high winds that resulted in flooding and storm surges across the area. The eye of the storm was located a few miles west of the area at issue in this matter: Jarvisburg, North Carolina.

In Jarvisburg, at 114 Caco Street, sits a house that is bordered by water on three sides—an unnamed canal to the south and east and the Albemarle Sound to the west. The house is a single-family, wood frame residence, with the two elevated floors supported on timber piles and the ground floor supported on a concrete slab-on-grade. The property is owned by plaintiffs, Gary and Rebecca Woodson, who live next door. The house has been rented for years to an area doctor, Dr. Robert Valentine.

The Woodsons insured the property at 114 Caco Street through Allstate. Allstate was acting as a "Write-Your-Own" Program carrier participating in the National Flood Insurance Program ("NFIP") at all times relevant to this matter. The NFIP is managed by the Federal Emergency Management Agency ("FEMA"), which carries a Standard Flood Insurance Policy ("SFIP"), which can be issued by Allstate. Allstate issued such an SFIP Policy (No. 1807391402) to the Woodsons. The policy provided flood insurance coverage for the house (capped at $250,000.00) and personal property (capped at $12,200.00) located at 114 Caco Street. The policy had a $1,000.00 deductible.

It is undisputed that Hurricane Irene struck Jarvisburg on August 27, 2011, and it is undisputed that when two insurance adjusters examined 114 Caco Street on August 31, 2011,

2

they observed serious damage to the house. The parties dispute, however, when the damage occurred, how it was caused, and, thus, whether it is rightly covered by the insurance policy.

    I.    The Damage To The House At 114 Caco Street Did Not Exist Prior to Hurricane Irene

The Court finds that there was no antecedent damage to the house at 114 Caco Street. In making this finding, the Court relies on the trial testimony of Gary Woodson, Robert Valentine, Frederick House, and George Barbour.

Woodson and Valentine were both in the house at 114 Caco Street regularly before Hurricane Irene. Both men testified at trial that the damage at issue here—including but not limited to a bowed and cracked garage floor, cracks in the dry wall, separation of the wall and ceiling, cracking tiles, a broken window, and a noticeable tilt in the floor—were not present before the storm.

Frederick House, a local engineer who both parties stipulated was an expert in structural engineering, also testified at trial as to whether the damage was pre-existing. House testified that the damage to the house at 114 Caco Street was 100% not the result of a preexisting condition.

Finally, George Barbour, a jointly-retained stipulated expert in structural engineering, also testified as to whether the damage to the house at 114 Caco Street was preexisting. The Court found Barbour's presentation and conclusions highly credible and affords them great weight. Barbour unequivocally testified that the damage to the house was caused by the storm, stating his belief that all the vertical differential settlement that occurred to the house occurred because of the storm.

Barbour also effectively rebutted defendant's attempt at demonstrating pre-existing damage. The firm retained by defendant to determine the cause of the damage and suggest a repair method, Rimkus Consulting Group (to be discussed, *infra*), posited that a crack in the

3

sheet rock and presence of a sealant material at the top left corner of the widow above the kitchen sink was evidence that the settlement of the house—and, thus, damage at issue—occurred before the storm. Barbour convincingly explained that this sealant was present at other locations throughout the house, including areas where there was no corresponding crack in the walls. Barbour also noted that the sealant was a consistent, yellowed color throughout the house. This information, combined with Woodson and Valentine's indications that they had never patched these areas, led Barbour to conclude that this sealant was most likely applied during construction and not as a repair effort by Woodson or Valentine before the storm.

For all the reasons above, the Court finds that the damage at issue in this case did not exist before Hurricane Irene.

II. The Damage To The House At 114 Caco Street Was Caused By Flooding, Wave Action, And Erosion

The Court finds that there was high wave action in the area around 114 Caco Street that persisted for roughly six to eight hours, flooded the area, seriously eroded the undersoil, scoured it out, and proximately and directly caused the immediate and resulting damage. This conclusion is dictated by every piece of scientific, expert, and physical evidence.

The first structural engineering expert to testify, Frederick House, stated unequivocally that the "most causative" forces were the scour and erosion of the soil under the slab, allowing wave forces over an extended period of time to exert forces both laterally and upwards. House's report, following his inspections of the house at 114 Caco Street, noted that a "[s]ustained period of immersion, continual wave action against concrete slab, and winds sufficient to deflect sail area of the house, together and simultaneous, caused structural damage throughout the home." Pls. Ex. 9, p. W-25. House also noted that "liquefaction of soils during the flood likely caused shifting in layers of sand . . . and peat." *Id.* However, on cross examination at trial, House

4

clarified that scour—not liquefaction—was responsible for the overwhelming majority of damage done to the house. House explained that the scour and wave action from the flood allowed water in which caused upward and downward loading on the pilings and house, which led to the damage at issue.

George Barbour, the other testifying structural engineer, reached similar conclusions after reviewing all documents provided to him—including three reports from the adjuster, photos from various sources, the Rimkus report, the property's geotechnical report, and the House report—and performing a site investigation.

Barbour's trial testimony, like his report, made it clear that the primary forces at work on the house were wind and flood and wave action. Barbour testified that the damage to the slab and, thus, ground floor was caused by flooding. When asked if erosion affected the house's pilings, Barbour's response was plain: "absolutely." Barbour testified that the flood advanced toward the residence, striking piles, eroding soil, and causing upward forces. For all these reasons, after considering all the evidence and conducting his site investigation, Barbour reached the only logical conclusion: "damage considered to be related to Hurricane Irene must include the undermining of the entire first floor as well as the unevenness of the first and second floors." Pls. Ex. 96, p. W-192.

Barbour also effectively called the Rimkus firm's second supplemental conclusions into question, noting that these findings indicated that the settlement *was* related to the storm, which, Barbour concluded, did not make sense with the earlier Rimkus findings. As to the remainder of the Rimkus report, the Court discounts the contents entirely, for reasons discussed *infra*.

For all the reasons above, the Court finds that the damage to the house at 114 Caco Street was proximately and directly caused by flooding, wave action, and erosion.

5

III. Damages

Plaintiffs have established the amount of damages through the House report as well as the trial testimony of House, Bryan Seawell, and Barbour. The House report provides a detailed listing of the necessary repairs and estimated cost of performing each of these repairs. The House report projects a total cost of repair of $272,473.00. Pls. Ex. 9, p. W-27. At trial, Seawall—the original general contractor of the residence and a later House employee—testified that these estimates came from the original subcontractors, who returned to 114 Caco Street to inspect and observe the damage and then provided estimated costs of repair. Barbour also reviewed the House estimates and found them to be reasonable and similar in scope to his own assessment, though he testified that the House figures were more detailed. For all these reasons, the Court finds that plaintiffs have proven damages in the amount of $233,398.00, which is the House total projected amount minus the loss of income and bulkhead repair costs, which plaintiffs concede are not included under the policy.

IV. Allstate's Denial Of Benefits To The Woodsons Was Done In Bad Faith And Constituted, In Fact, An Unfair Trade Practice

The Court finds that the denial of benefits to the Woodsons was a flagrant act of bad faith on the part of the carrier.

Flood insurance was enacted by Congress in the Omnibus Housing Act of 1968 as a remedial program. The legislation was in response to instances of interior flooding in various places across America and an unwillingness of any major hazard insurance carrier to provide policies covering rising water. So, Congress intervened, took the risk, and created national flood insurance. It is not lost on the Court that the insurance at the heart of this matter is the result of a deliberate national policy to provide coverage to property owners suffering major losses due to flooding.

6

Despite this origin, Allstate has endeavored at every step of the process to deny coverage to plaintiffs' worthy claim. Here, plaintiffs did everything they needed to do to recover and all the evidence supports the position that plaintiffs were entitled to recover, and yet, plaintiffs' claims were denied. This is an example of the worst kind of misconduct on the part of an insurance carrier with one of its insured: plaintiffs did everything they knew to do, including providing strong and uncontroverted proof that the damage to the house was from the flood waters, and, yet, Allstate engaged in a long pattern of denial and cover-up.

A key component of Allstate's efforts to thwart plaintiffs' claim was the so-called Rimkus report. This report, performed by Amor Camatcho of Rimkus Consulting Group, came to the rather extraordinary conclusions—rebutted by both structural engineering experts at trial—that the pertinent damage was pre-existing and that "there was no damage or permanent movement of the structure resulting from the storm surge from Hurricane Irene" and, thus, recommended repairing the damage by placing "additional sand fill material [] in the void areas." Def. Ex. 16, p. PC 171. Mr. House testified that this solution was "unfounded," would not solve the house's problems, and would be a waste of time and money. Mr. Barbour testified to the same, also describing the plan as a "waste of money." However, as it turns out, the plan would not have wasted much money. To perform this "repair," Allstate offered the Woodsons an astonishing $1,134.99, which, minus their deductible, meant the Woodsons would actually receive $134.99 to repair the damage to their home. After considering the interlocking nature of the expert reports in this case—including the report of the jointly retained structural engineering expert, Mr. Barbour—the Court finds that the Rimkus report was not based in fact. Instead, it was based on Allstate getting the report they needed in order to deny coverage. Thus, the Court affords it no weight.

7

For all these reasons, the Court finds, as a matter of fact, that the denial of the Woodsons' claim was an act of bad faith on the part of Allstate.

## CONCLUSIONS OF LAW

I.  Breach of Contract

Federal common law governs the interpretation of federal flood insurance policies. *Studio Frames, Ltd. v. Std. Fire Ins. Co.*, 483 F.3d 239, 244–45 (4th Cir. 2007). Under the federal common law, courts draw upon standard principles of insurance law to resolve disputes concerning SFIP coverage. *Id.* at 245. Under the principles of interpretation relevant to this matter, the Court should apply directly any policy language that is clear and unambiguous. *Id.* If the disputed language is susceptible to different constructions, the Court is to adopt the construction most favorable to the insured. *Id.* The insured has the initial burden of establishing that a loss is covered by the insured's policy, but the insurer bears the burden of proving an exclusion is applicable. *Allstate Ins. Co. v. Bates*, 185 F. Supp. 2d 607, 610 (E.D.N.C. 2000) (citing *Nationwide Mut. Ins. Co. v. McAbee*, 268 N.C. 326, 150 S.E.2d 496, 497 (1966)).

As flood insurance is a creature of federal law and policy, as discussed *supra*, the terms and conditions of the SFIP are determined by FEMA. 42 U.S.C. § 4011. With this authority, FEMA has authorized so-called "Write Your Own" ("WYO") companies to issue SFIPs under their own name. *See* 44 C.F.R. §62.23.

The SFIP explicitly covers "direct physical loss by or from flood." Pls. Ex. 10, p. W-61. The policy defines "flood" as

> a general and temporary condition of partial or complete inundation of two or more acres of normally dry land area or of two or more properties (at least one of which is your property) from (a) overflow of inland or tidal waters; (b) unusual and rapid accumulation of runoff or surface waters from any sources; (c) mudflow.

*Id.* The definition also includes "[c]ollpase or subsidence of land along the shore of a lake or similar body of water as a result of erosion of undermining caused by waves or currents of water exceeding anticipated cyclical levels that result in a flood" as defined above. *Id.* The FEMA regulations, which govern the policy pursuant to Article IX, add the following to the end of the previous definition "or suddenly caused by an unusually high water level in a natural body of water, accompanied by a severe storm, or by an unanticipated force of nature, such as a flash flood or an abnormal tidal surge, or by some similarly unusual and unforeseeable event." 44 C.F.R. § 59.1. Once again, the federal policy goal of providing coverage for flood damage is apparent.

The SFIP is not without exclusions, however. Pertinent to the instant matter is "Exclusion C," which excludes from coverage "loss to property caused directly by earth movement even if the earth movement is caused by flood" and includes earthquakes, landslides, land subsidence, sinkholes, destabilization due to subsurface water accumulation, and gradual erosion as such examples of earth movement. Pls. Ex. 10, p. W-69. However, excluded from the exclusion (and thus covered under the policy) are "losses from . . . land subsidence as a result of erosion that [is] specifically covered under [the policy's] definition of flood," discussed above. *Id.* FEMA defines this flood-related erosion as

> the collapse or subsidence of land along the shore of a lake or other body of water as a result of undermining caused by waves or currents of water exceeding anticipated cyclical levels or suddenly caused by an unusually high water level in a natural body of water, accompanied by a severe storm, or by an unanticipated force of nature, such as a flash flood or an abnormal tidal surge, or by some similarly unusual and unforeseeable vent which results in flooding.

44 C.F.R. § 59-1.

Here, it is apparent that the damage to the house at 114 Caco Street was caused by erosion resulting from Hurricane Irene's flood, storm surge, and waves, which undermined the

9

residence's ground floor slab. The damage in this case was caused by subsidence of the land along the shore(s) of a body of water as a result of undermining caused by waves and an unusually high water level in a natural body of water accompanied by a severe storm. As the relevant policy language is clear and unambiguous, it applies to this case and demands only one result. The Court finds that coverage exists under the policy for the damage sustained to the house at 114 Caco Street as a result of Hurricane Irene.

Allstate's counterargument—that the damage was caused by earth movement which is excluded from coverage under the policy—does not carry the day as a matter of fact, discussed *supra*, or law. Even if this earth movement occurred as Allstate claims it did, it would not preclude finding that the damage was covered by the policy, as the loss is still insured when "the covered cause is the predominant efficient cause of the loss." *Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042 (4th Cir. 1979). As the record and trial testimony have established that the covered causes predominate, the argument fails. Allstate has also attempted to argue that the damage to the higher floors of the house cannot have been caused by the flood since the floodwaters did not reach the upper floors, but this argument defies both law and logic. The statutory authorization for the NFIP permits FEMA to "establish and carry out a national flood insurance program which will enable interested persons to purchase insurance against loss resulting from physical damage to or loss of real property or personal property related thereto *arising from* any flood occurring in the United States." 42 U.S.C. § 4011(a) (emphasis added). It is clear that flood waters do not necessarily have to touch an area of a house for that area to be damaged as a result of flooding. As the plain language of the law clearly covers the situation at hand, this argument also fails.

Having conclusively established that the damage to the home was covered by the policy, the Court also finds that the Woodsons did everything they needed to do to comply with the demands of the policy. The Woodsons' proof of loss was timely submitted and sufficiently adequate and thorough to merit recovery. As to timeliness, the Court finds that, pursuant to FEMA bulletin W-11120, the Woodsons had until January 24, 2012, to submit their proof of loss. *See* Pls. Ex. 3. As the Woodsons submitted their proof of loss on January 15 and then supplemented with the final necessary component on January 24, their submission was timely and recovery is not barred on this ground. As to the thoroughness of the repair estimates, a recurring issue at trial, the Court finds that the estimates contained in the House Report are sufficient and do not present a bar to recovery. Despite defense counsel's statements to the contrary in closing argument, the case he cited to the Court actually establishes that the insured need not "submit every bill, receipt, and related document," but instead must provide "enough support to allow the insurer to evaluate the merits of the claim, including the estimated cost of repair." *Sun Ray Vill. Owners Ass'n v. Old Dominion Ins. Co.*, 546 F. Supp. 2d 1283, 1291 (N.D. Fla. 2008). The Court finds that the House Report provided sufficiently thorough repair estimates, and recovery is not barred on this ground.

In sum, the Court finds that the damage to the house at 114 Caco Street was covered by the policy, that no policy exclusions apply to justify denying coverage, and that the Woodsons' proof of loss was sufficient. Accordingly, Allstate's denial of coverage constitutes a breach of contract and the Woodsons are entitled to actual damages in the amount of $233,398.00.

II.  Unfair Trade Practices

North Carolina General Statute § 75-1.1 declares unlawful "unfair or deceptive acts or

11

practices in or affecting commerce." The penalty for such a violation is treble damages. N.C.G.S. § 75-16. Any party claiming to be exempt from § 75.1-1 bears the burden of proof with respect to such claim. N.C.G.S. § 75-1.1. Section 75-1.1 does not require proof of deliberate acts of deceit or bad faith; however, in the instant matter, this higher standard has been met. *See Edwards v. West*, 128 N.C. App. 570, 495 S.E.2d 920 (1998), cert. denied, 348 N.C. 282, 501 S.E.2d 918 (1998).

As held from the bench at the end of trial and reiterated herein, the Court is compelled to find that the denial of the Woodsons' claim was, in fact, an act of bad faith and an unfair trade practice. As such, plaintiffs deserve treble damages.

The Court is aware of other cases finding that such state extra-contractual statutes are preempted by the federal program and its goal of reducing fiscal pressure on federal flood relief efforts. However, the Court finds that treble damages are warranted in this case because of the higher purpose of the NFIP: providing relief for worthy claims.

It is impossible to decide this case without considering the context in which it is before the Court. This case is based on the denial of a claim for coverage under an insurance policy that is the product of an avowed federal interest in providing relief for worthy claims. This is the bedrock principle and organizing purpose upon which federal flood insurance was founded. Thus, when this principle is violated in such a flagrant manner as seen in the facts before the Court now, it is important to send a message that these bad faith denials will not be tolerated. The Court finds that permitting remedies such as treble damages in the rare instance of a bad faith denial in fact promotes the goals of the federal flood insurance program much more faithfully than denying such a claim based on preemption.

Accordingly, the Court finds that the damages due plaintiffs are to be trebled.

## CONCLUSION

For the foregoing reasons, the Court finds that plaintiffs have met their burden on all claims before the Court. Plaintiffs are entitled to damages in the amount of $233,398.00 pursuant to their breach of contract claim and treble damages pursuant to their unfair trade practices claim. Therefore, the clerk is DIRECTED to order judgment in favor of plaintiffs in the amount of $700,194.00.

SO ORDERED, this 3 day of May, 2016.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

13

Case 2:13-cv-00021-BO Document 45 Filed 05/04/16 Page 13 of 13